The CITY OF NEW YORK and the New York City Transit Authority, Plaintiffs,

v.

PULLMAN INCORPORATED, Pullman-Standard, a Division of Pullman Incorporated, and Rockwell International Corporation, Defendants.

No. 79 Civ. 3219.

United States District Court,
S.D. New York.

Aug. 21, 1979.

Allen G. Schwartz, Corp. Counsel, New York City, for plaintiffs; Bruce S. Kaplan, Anthony Z. Scher, Jane Winer, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants Pullman Inc. and its Division, Pullman Standard; Philip C. Potter, Jr., Thomas J. Aquilino, Jr., New York City, Thomas A. Schweitzer, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant Rockwell Intern. Corp.; Charles H. Harff, Donald I. Strauber, Richard J. Ney, Jerome C. Katz, Claudia L. Taft, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a motion by plaintiffs to remand this action[1] to the Supreme Court of the State of New York from whence it was removed to this Court upon defendants' petition alleging diversity of citizenship.[2] It is not disputed that such diversity exists.[3] The motion to remand is based on a provision in the agreement out of which this action arises that provides the New York State courts shall have jurisdiction over any controversies arising thereunder, the exact terms of which are set forth hereafter.

Plaintiffs, The City of New York and The New York City Transit Authority (the "City") and the defendants, Pullman Incorporated and its subdivision Pullman-Standard, entered into an agreement whereby Pullman was to manufacture and deliver to the City 754 subway passenger cars for use in the New York City Transit System to be equipped with trucks[4] designed and manufactured by defendant Rockwell International Corporation (the defendants are collectively referred to as "Pullman"). The City commenced this action against the defendants upon allegations of defects in the trucks and delays in delivery of the cars. The complaint sets forth claims of breach of contract, breach of warranty and strict liability in tort. The defendants deny plaintiffs' allegations and in addition assert counterclaims for balances due under the

1. 28 U.S.C. § 1447(c).

2. 28 U.S.C. § 1441(a).

3. 28 U.S.C. § 1332(a)(2). Plaintiffs are citizens of New York; Pullman is a citizen of Delaware (incorporation) and Illinois (principal place of business) and Rockwell is a citizen of Delaware

(incorporation) and Pennsylvania (principal place of business).

4. Each subway passenger car body is mounted on an undercarriage composed of two trucks attached to each car and which support the car's motor and wheels.

contract and seek mitigation of any damages as long as the City continues to use the subway cars. Pullman has cross-claimed against Rockwell for any amounts for which Pullman may be held liable on the ground that plaintiffs' claims are based on Rockwell's conduct.

The contract, referred to by the parties as Equipment Contract R–46, is composed of a series of documents including an invitation to bid issued by the City and a "Contractor's Proposal"[5] executed by defendant Pullman on April 7, 1972 and submitted by it to the City.[6] It contains the following:

(17) (This item is to be filled in only by a foreign corporation that does not intend to submit proof of its authority to transact business in the State of New York.)

The undersigned bidder, a foreign corporation, agrees as follows: That service of any process, in any action or proceeding to be instituted or commenced by the City of New York or the New York City Transit Authority against the said bidder is to be made by registered special delivery air mail addressed to said bidder at its home office at _____ (Street or Avenue), _____ (City), _____ (State), or upon _____ Esqs., the said bidders' legal representatives and attorneys in New York, at their law offices located at (Street or Avenue), _____ N.Y., at the option of The City of New York and the New York City Transit Authority. . . .

> This contract is to be construed pursuant to the Laws of the State of New York and the undersigned bidder agrees that only the New York courts shall have jurisdiction over this contract and any controversies arising out of this contract.

The undersigned bidder also agrees to submit any controversies or problems arising out of this contract to the New York courts and the New York courts only.

The bidder also agrees that it will pay all proper taxes arising out of the contract.

■ Based upon the foregoing, the City contends that Pullman not only expressly stipulated New York State courts as the forum in which to litigate any suit arising under the contract but that it also impliedly waived its right of removal under the federal diversity statute.[7]

Pullman resists the City's motion upon a number of grounds—first, that Item 17 is not part of their agreement; second, that even it it is, the designation of New York courts as the forum choice does not exclude a federal court sitting in New York State when jurisdiction is based upon diverse citizenship; third, even if the language of Item 17 does not compel this interpretation, it is ambiguous and since the City drafted the agreement the ambiguity is to be resolved against the City and in favor of Pullman; and finally, if the choice of forum provision is part of the contract, its enforcement would be unreasonable, unfair and unjust.

■ Necessarily, we first consider the contention that Item 17 is not part of the contract, since if this position is upheld it would at once end further inquiry. It is not disputed that the Contractor's Proposal when signed and submitted by Pullman as bidder and accepted by the City was part of the contract between them. Pullman, however, contends that Item 17 is excluded from the Contractor's Proposal. In support

---

**5.** The "Contractor's Proposal" is an extensive printed form prepared by the City with various blank spaces for specific prices, quantities and delivery terms to be filled in by a bidder, which, when so completed, constitutes the bid by the contractor for Contract R–46.

**6.** The City ultimately accepted the Pullman bid and the final contract was executed on August 30, 1972.

**7.** Defendant Rockwell was not a party to the agreement. However, to effect removal under 28 U.S.C. § 1441(a) all defendants must have the right to do so. Plaintiffs contend that since Pullman gave up its right of removal, its joinder with Rockwell in the removal petition was of no effect and invalid. *See Chicago, Rock Island & Ry. Co. v. Martin*, 178 U.S. 245, 20 S.Ct. 854, 44 L.Ed. 1055 (1900).

of its position Pullman notes that it did not fill in the blank spaces in Item 17 of the printed form of the "Contractor's Proposal" that it submitted to the City as part of its bid; accordingly, it argues it did not accept or agree to Item 17 and that the entire balance of the Item, including the provision relied upon by the City to remand the action, was not consented to by it. Pullman states that the reason it did not fill in the blank spaces was because it was and is a foreign corporation authorized to transact business in the City of New York; that it intended to and in fact did submit proof of such authority thus obviating the need to fill in the blank spaces or otherwise agree to Item 17—that is the choice of forum provision and other matters referred to therein. The argument is superficial and without substance. Item 17 was directed to the following matters: (1) amenability to process and designation of an agent to receive process in instances of bidders that were foreign corporations which did not intend to submit proof of authority to do business in New York State; (2) choice of law to govern the contract; (3) choice of forum in the event of litigation; and (4) payment of taxes arising out of the contract. The clear purpose of the blank portion of Item 17 was to have it executed by a bidder that was a foreign corporation, not authorized to do business within the state, or that could not be found for process in order to assure that in the event of an action by the City against such a contractor, service of process could be effected upon an authorized agent and jurisdiction acquired

over such a corporation.[8] In this instance, Pullman submitted proof of its authority to do business in New York State which, of course, meant it was amenable to process within the State.[9] The submission by Pullman to the City of its certificate authorizing it to do business within the State of New York necessarily obviated the need to fill in the blank spaces of Item 17. However, the submission by Pullman of a certificate which made it amenable to service of process did not thereby eliminate, as Pullman contends, the balance of Item 17 containing the provisions relating to choice of law, the choice of forum, and the agreement to pay taxes arising out of the contract. This is underscored by the fact that the forum selection clause itself twice commits the "undersigned bidder" to the terms of the choice of forum and of applicable law, and further, the "bidder also agrees it will pay all proper taxes." Furthermore, whether a bidder was or was not authorized to do business in New York State was irrelevant either to choice of law, choice of forum or the payment of taxes. It defies common sense that these provisions would be inserted in one event but not the other. Accordingly, the conclusion is compelled that the forum selection provision is part of the parties' agreement.

 Thus we consider the merits of the respective and conflicting contentions. At the outset it is noted that a party's consent to process and jurisdiction in a particular forum [10] does not necessarily constitute a waiver of the right of removal under the

---

**8.** *See National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964).

**9.** A foreign corporation authorized to do business in New York State designates the Secretary of State as an agent for the service of process upon it. N.Y. Business Corporation Law § 304 (McKinneys 1963).

**10.** Agreements entered into by knowledgeable parties in an arm's-length transaction that contain a forum selection provision are enforceable absent a showing of fraud, overreaching, unreasonableness or unfairness. *Bremen v. Zapa-*

*ta Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Indeed such agreements may entirely eliminate jurisdiction in the United States. *Gaskin v. Stumm Handel GmbH*, 390 F.Supp. 361 (S.D.N.Y.1975). On the other hand, a contractual choice of forum clause is unenforceable if its enforcement would contravene a strong policy of a forum in which suit is brought, whether declared by statute or by judicial decision. *Boyd v. Grand Trunk W. R. Co.*, 338 U.S. 263, 70 S.Ct. 26, 94 L.Ed. 55 (1949). *See also Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955).

federal diversity statute.[11] In the absence of a specific waiver, the question is the meaning of the language employed—was the choice of forum provision intended to exclude a federal court sitting in the State of New York; also, was it intended as a waiver of the right of removal if a basis for removal existed?

■ The City has submitted an affidavit of an official who played a significant role in the drafting of the language contained in Item 17 who states that the choice of forum provision was intended to make the New York State courts the exclusive forum and "was clearly written to preclude litigation from taking place in the federal forum" and further was intended to be a selection of the State Court in New York, not merely a geographical location. The Contractor's Proposal was a printed form prepared by the City with the bidder filling in pertinent blank spaces to contain its bid with respect to prices, quantities, deliveries and other substantial contractual matters. Item 17 was not the subject of negotiation or arm's-length bargaining between the parties. Whether the clause was intended to confine jurisdiction solely to a court of New York State and to exclude a federal court sitting in New York State was never discussed. Whatever the draftsman's subjective intention, undisclosed to the bidder, may have been, it does not govern.

■ What does govern is an objective consideration of the language even though it may not accord with the subjective intent of the draftsman.[12] If the purpose was to preclude a federal forum, explicit language to that effect would have foreclosed any issue on the matter.[13] Here, the language, upon its face, does not, as the draftsman asserts, "preclude litigation from taking place in the federal forum," nor does it clearly indicate to a bidder that it constitutes a waiver of its right to petition for removal under the federal diversity statute. Thus we come to the hard core of the controversy. The City contends that the forum selection provision, particularly the language by which the bidder agrees "to submit any controversies or problems arising out of this contract to the New York courts and the New York courts only," should be read to exclude all courts except the state courts of New York. To the contrary, Pullman argues that the phrase "New York courts" means both state and federal courts located in the State of New York and that a federal court sitting in the State of New York is not excluded as a proper forum where diversity exists. If the contract language refers to the state courts to the exclusion of the federal courts, it is a term of sovereignty; on the other hand, if it encompasses New York State courts and the federal court sitting in the State of New York, it is a term of geography. The cases relied upon by the parties shed little light on the subject.[14] The language chosen

11. An agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion, *Keaty v. Freeport Idonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974), or it leaves it in the control of one party with power to force on its own terms the appropriate forum. *See, e. g., Monte v. Southern Delaware County Authority*, 321 F.2d 870 (3d Cir. 1963).

12. *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 292 N.Y.S.2d 878, 239 N.E.2d 628 (1968); *Gearns v. Commercial Cable Co.*, 293 N.Y. 105, 56 N.E.2d 67 (1944); *Porter v. Commercial Cas. Ins. Co.*, 292 N.Y. 176, 54 N.E.2d 353 (1944); *Peripheral Equipment Inc. v. Farrington Mfg. Co.*, 29 A.D.2d 11, 285 N.Y.S.2d 99 (1st Dep't 1967).

13. *See, e. g., Dri Mark Products, Inc. v. Meyercord Co.*, 194 F.Supp. 536 (S.D.N.Y.1961); *Dav-*

*ila v. Hilton Hotels International, Inc.*, 97 F.Supp. 32, 34 (D.P.R.1951).

14. None of the cases cited by the parties is dispositive of the present dispute; each may be distinguished on its own facts. For example, both the City and Pullman contend that *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), controls the outcome of the case at bar. In *Bremen*, however, the Court only held that knowledgeable parties in an arm's-length transaction may agree to waive jurisdiction in a particular forum in which their dispute might otherwise have been heard. In the instant case, however, the issue is not whether the parties *may* waive their rights, but whether in fact they did so. Similarly, Pullman cites a line of cases in which the federal courts upheld federal jurisdiction over foreign corporations transacting business

by the City to express its intention to exclude all fora except the courts of the State of New York is not as restrictive as the City asserts. This conclusion is grounded in the application of two distinct rules of construction. The normal construction of the jurisdiction rules includes a presumption that, where jurisdiction exists, it cannot be ousted or waived absent a clear indication of such a purpose; and the normal rule for construing language is to allow the scope of a term's meaning to expand to its greatest natural perimeters. Thus, if "New York courts" can mean both federal and state courts, it should be so construed unless express and restrictive language indicates otherwise.[15]

█ Furthermore, where, as here the language is susceptible of both meanings, each equally plausible, it may be said to be ambiguous, in which circumstance, under normal rules of construction, the ambiguity is to be resolved in favor of Pullman.[16] But the City counters that the rule of *contra proferentem* is inapplicable because of a provision in the contract contained in "Information for Contractors" that "[p]rospec-

tive bidders must examine the contract documents carefully . . . and must request . . . an interpretation or correction of every patent ambiguity, inconsistency or error." In the light of the discussion hereinabove, it can hardly be urged that the provision at issue is a "patent" ambiguity. Pullman reasonably could assume, as it has urged in opposition to the motion to remand, that the choice of forum language as drafted did not exclude a federal court sitting in the State of New York. Moreover, a more sensible view of the warning provision is, as defendant contended upon oral argument, that it applies to obvious errors in stated amounts, dates, quantities and other matters which, unless called to the City's attention, would result in a waiver of any claim with respect thereto.

In the light of the Court's holding that the provision is ambiguous, it is unnecessary to consider the defendants' further contention that to enforce the provision would be unjust or unfair. Under all the circumstances, the City's motion to remand is denied.

in the forum state. *See, e. g., Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167 (1939); *Ex parte Schollenberger*, 96 U.S. 369, 24 L.Ed. 853 (1877). But in those cases the Court reached its result after ascertaining the intent of the state legislatures in enacting the service of process and jurisdiction statutes involved; such legislative purpose, of course, sheds no light on the intentions of these parties when they entered this contract.

Furthermore, Pullman cites an equally inapposite line of cases which held that a federal court, sitting in diversity, is " 'in effect, only another court of the State.' " *Lummus Co. v. Commonwealth Oil Refining Co.*, 195 F.Supp. 47, 52 (S.D.N.Y.1961) (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 108, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). Those cases, however, merely require federal courts sitting in diversity to apply the substantive *law* of the state in which they sit; the cases neither define the power of parties to waive federal jurisdiction, nor illuminate ways in which to construe the parties' intentions.

The one case cited by the parties whose facts most closely parallel those of the instant case is *Spatz v. Nascone*, 364 F.Supp. 967 (W.D.Pa. 1973). In *Spatz* the Court found inherently ambiguous a forum selection clause by which

the parties had consented to jurisdiction in "the Courts of the Commonwealth of Pennsylvania." *Id.* at 970. Even *Spatz*, however, is distinguishable from the case at bar. Apart from the differences in language between the *Spatz* provision ("the Courts of the Commonwealth of Pennsylvania") and the one involved here ("the New York courts only"), the *Spatz* contract had been negotiated by the parties, whereas the one involved here was drafted entirely by one side, the City.

15. Cf. *Lummus Company v. Commonwealth Oil Refining Co.*, 195 F.Supp. 47, 52 (S.D.N.Y. 1961), where this Court stated that a federal court sitting in a diversity case was "in effect, only another court of the State." *See also, Ex parte Schollenberger*, 96 U.S. 369, 377, 24 L.Ed. 853 (1877), "while the Circuit Court may not be technically a court of the Commonwealth, it is a court within it . . . ."

16. See *Stern v. Satra*, 539 F.2d 1305, 1310 (2d Cir. 1976); *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 187 (1975); *Evelyn Building Corp. v. City of New York*, 257 N.Y. 501, 513, 178 N.E. 771 (1931).